IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HDS RETAIL NORTH AMERICA, L.P.,    §
                                   §
         Plaintiff,                §
                                   §
v.                                 §    CIVIL ACTION NO. H-10-3399
                                   §
PMG INTERNATIONAL, LTD.,           §
                                   §
         Defendant.                §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] is Plaintiff's Motion for Partial Summary Judgment (Doc. 68).  The court has considered the motion, all relevant filings, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's Motion for Partial Summary Judgment be **GRANTED IN PART, DENIED IN PART.**

### I.  Case Background

The dispute between the parties in the present case concerns contractual obligations.  Plaintiff HDS Retail North America, L.P. ("Plaintiff") filed this action against Defendant PMG International, Ltd. ("Defendant") seeking a declaration that Defendant is not entitled to receive "earnout" payments under an LLC Interest and Stock Exchange Purchase Agreement entered into by the parties and that Plaintiff did not breach that agreement by failing to make earnout payments to Defendant.  Defendant counterclaims for the amount of the earnout payments allegedly owed

_____

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 78.

by Plaintiff.

**A.** **Factual History**

From 1984 through late 2008, Defendant owned News and Gift Shops International, a "retailer of magazines, souvenirs, candies [and] airport products," and other related subsidiaries (collectively, "NGSI").[2]   Defendant, through NGSI, owned and operated retail locations in a number of airports, including the Austin-Bergstrom International Airport ("Austin Airport") and the San Antonio International Airport ("San Antonio Airport").[3]

In January 1999, NGSI entered into a Retail Concession Lease Agreement ("Austin Agreement") with the City of Austin, Texas, whereby NGSI leased two retail spaces at the Austin Airport.[4]   Four months later, in May 1999, NGSI and Sierra Concessions entered into an agreement that enabled NGSI to operate a third retail space at the Austin Airport, effective December 30, 1998.[5]   NGSI also entered into a number of Concession Agreements with the City of San Antonio, Texas, whereby NGSI leased Terminal One venue spaces 114, 140, 154, and 178 and Terminal Two venue spaces 204, 260, and 262

---

[2]    See Doc. 69-3, Ex. 2 to Pl.'s Mot. for Partial Summ. J., William Salomon Depo. I, p. 10.

[3]    See Doc. 69-4, Ex. 3 to Pl.'s Mot. for Partial Summ. J., Brian Weiner Depo., p. 14.

[4]    See Doc. 69-5, Ex. 4 to Pl.'s Mot. for Partial Summ. J., Austin Agreement.

[5]    See Doc. 69-6, Ex. 5 to Pl.'s Mot. for Partial Summ. J., Letter Confirming Agreement Between NGSI & Ray Quintanilla, d/b/a Sierra Concessions; Doc. 69-7, Ex. 6 to Pl.'s Mot. for Partial Summ. J., Joint Venture & Transfer Agreement Dated June 30, 2009.

from San Antonio.[6]

### 1. Agreement Between Defendant and Plaintiff

In late 2007 or early 2008, Defendant began discussions with Plaintiff's representatives regarding the possible sale of NGSI to Plaintiff.[7]   At around the same time, NGSI entered into negotiations with Sierra Concession's joint venture partner, Harlon's Bar-B-Q Bergstrom, IV, Ltd. ("Harlon's), to take over Harlon's venues in the Austin Airport.[8]   On September 3, 2008, Plaintiff and Defendant entered into an LLC Interest and Stock Exchange Purchase Agreement ("Stock Purchase Agreement") wherein Defendant agreed to sell NGSI to Plaintiff.[9]   The parties amended the Stock Purchase Agreement in writing on four separate occasions: October 29, 2008, November 26, 2008, December 5, 2008, and December 11, 2008.[10]   Defendant alleges that, during the time between its

---

[6]      See Doc. 69-10, Ex. 9 to Pl.'s Mot. for Partial Summ. J., 2002 Concession Agreement for Space 114; Doc. 69-11, Ex. 10 to Pl.'s Mot. for Partial Summ. J., Concession Agreement for Space 140; Doc. 69-12, Ex. 11 to Pl.'s Mot. for Partial Summ. J., Concession Agreement for Space 154; Doc. 69-13, Ex. 12 to Pl.'s Mot. for Partial Summ. J., Concession Agreement for Space 178; Doc. 69-14, Ex. 13 to Pl.'s Mot. for Partial Summ. J., Concession Agreement for Space 204; Doc. 69-15, Ex. 14 to Pl.'s Mot. for Partial Summ. J., Concession Agreement for Space 260; Doc. 69-16, Ex. 15 to Pl.'s Mot. for Partial Summ. J., Concession Agreement for Space 262.

[7]      See Doc. 69-3, Ex. 2 to Pl.'s Mot. for Partial Summ. J., William Salomon Depo. I, pp. 14-17.

[8]      See id. at pp. 62-63.

[9]      See generally Doc. 69-1, Ex. 1A to Pl.'s Mot. for Partial Summ. J., Stock Purchase Agreement.

[10]      See Doc. 69-29, Ex. 21 to Pl.'s Mot. for Partial Summ. J., 2nd Amendment to Stock Purchase Agreement Dated Nov. 26, 2008; Doc. 69-30, Ex. 22 to Pl.'s Mot. for Partial Summ. J., 3rd Amendment to Stock Purchase Agreement Dated Dec. 5, 2008; see also Doc. 40, Pl.'s 1st Am. Compl., ¶ 8; Doc. 86, Def.'s Sealed

initial discussions with Plaintiff's representatives and the execution of the Stock Purchase Agreement, Defendant was in negotiations, or anticipated negotiations, to amend or extend its leases in the Austin Airport and San Antonio Airport.[11]  Defendant had also won a bid to combine two of its spaces at the San Antonio Airport to form a new shop, and was in negotiations to take over operations run by Harlon's, which had had problems making rent payments and maintaining inventory, at the Austin Airport.[12]  On December 11, 2008, the Stock Purchase Agreement closed.[13]

The Stock Purchase Agreement included three earnout provisions under which Defendant would be entitled to up to $1,400,000 upon the occurrence of specific conditions.[14]  Plaintiff claims that the requisite conditions of the following two earnout provisions, as amended, were not satisfied:

> (a) If, prior to the third (3rd) anniversary of the Closing Date [December 11, 2008], the San Antonio Agreements are amended, restated or substituted such that the terms and conditions of such amendment, restatement, or substitution and the pro forma operation of the Business of Subsidiaries of

---

Resp. to Pl.'s Mot. for Partial Summ. J., ¶ 2.

[11]   See Doc. 86, Def.'s Sealed Resp. to Pl.'s Mot. for Partial Summ. J., ¶ 3.

[12]   See Doc. 69-3, Ex. 2 to Pl.'s Mot. for Partial Summ. J., William Salomon Depo. I, pp. 37, 62-63; Doc. 69-25, Ex. 18 to Pl.'s Mot. for Partial Summ. J., Harlon Brooks Depo. I, pp. 20, 79-80.

[13]   See Doc. 69-31, Ex. 23 to Pl.'s Mot. for Partial Summ. J., Def.'s Resp. to Pl.'s Req. for Admissions, ¶ 1.

[14]   See Doc. 69-1, Ex. 1A to Pl.'s Mot. for Partial Summ. J., Share Purchase Agreement, pp. 19-20, Art. II, § 2.4.1.

4

Companies parties to the San Antonio Agreements would result in gross revenues of at least six million five hundred thousand dollars and no cents ($6,500,000.00) for the fiscal year ending December 31, 2010 or the fiscal year ending December 31, 2011, in accordance with the projections to be prepared and submitted by [Plaintiff] in response to the request for proposal from the City of San Antonio, Texas in respect of San Antonio International Airport, then upon the execution and delivery (even if the execution and delivery occurs after the third (3rd) anniversary of the Closing Date) of one or more agreements in writing evidencing such terms and conditions with respect to all of the San Antonio Agreements, [Plaintiff] shall pay to [Defendant] the aggregate amount of six hundred thousand dollars and no cents ($600,000.00).

. . .

(c) if, prior to the first (1st) anniversary of the Closing Date [December 11, 2008], the Austin Agreement is amended so that the term of the Austin Agreement expires no sooner than June 30, 2016, then upon (i) the execution and delivery (even if the execution and delivery occurs after the first (1st) anniversary of the Closing Date) of an agreement in writing evidencing such amendment to the Austin Agreement, and (ii) the execution and delivery (even if the execution and delivery occurs after the first (1st) anniversary of the Closing Date) by the City of Austin, Texas, and Bergstrom Capital News LLC (or its successor in interest) of a lease agreement for the lease of all the premises located at Austin-Bergstrom International Airport that are currently subject to the Austin Bergstrom Agreement, namely, the venues known as "2C" (1365 sq ft), "5" (1540 sq ft), "6" (500 sq ft), and "8" (929 sq ft), plus any support area of 1025 sq ft, for a term that expires no sooner than June 30, 2016, containing such terms and conditions as shall be reasonably acceptable to [Plaintiff] or an Affiliate thereof (the "Harlon Transaction"), [Plaintiff] shall pay to [Defendant] the aggregate amount of five hundred thousand dollars

and no cents ($500,000.00).[15]

## 2. Post-Closing Events

Regarding the venues at the San Antonio Airport, Plaintiff sought an extension of several of the leases about seven months after the Stock Purchase Agreement closed, on July 9, 2009.[16]  The City of San Antonio did not grant the requested lease extensions, but instead issued a public request for proposals ("RFP") for three of the existing leases set to expire and three spaces in a new terminal that would replace existing venues operated by Plaintiff.[17] On October 12, 2009, Plaintiff submitted a proposal in response to the RFP, but lost to a competitor's bid for the leases; the competitor's bid was then recommended by the San Antonio Airport to the San Antonio City Council for approval.[18]

In exchange for a payment of $100,000 to Defendant,

---

[15]    _Id._ at p. 20, Art. II, §§ 2.4.1(a), 2.4.1(c); _see also_ Doc. 69-29, Ex. 21 to Pl.'s Mot. for Partial Summ. J., 2nd Am. to Share Purchase Agreement. The Stock Purchase Agreement includes a provision in which the parties agreed to "use commercially reasonable efforts to bring about the timely fulfillment of each of the conditions precedent to the obligations of the other parties hereto set forth in this Agreement." Doc. 69-1, Ex. 1A to Pl.'s Mot. for Partial Summ. J., Share Purchase Agreement, p. 48, Art. V, § 5.4.  Neither party raises this contractual provision in its arguments.  The court nonetheless finds that § 5.4 of the Stock Purchase Agreement does not provide a contractual obligation for Plaintiff to make any efforts to cure Harlon's deficiencies in meeting the closing terms of the Harlon's Agreement.

[16]    _See_ Doc. 69-32, Ex. 24A to Pl.'s Mot. for Partial Summ. J., Jeffry Sailer Depo., p. 141; Doc. 69-34, Ex. 25 to Pl.'s Mot. for Partial Summ. J., Letter from Jeffry Sailer to Frank Miller Dated July 9, 2009.

[17]    _See_ Doc. 69-32, Ex. 24A to Pl.'s Mot. for Partial Summ. J., San Antonio Airport RFP for Terminal 1 and Terminal B.

[18]    _See_ Doc. 69-35, Ex. 26A to Pl.'s Mot. for Partial Summ. J., Proposal from HDS re: San Antonio Leases; Doc. 69-32, Ex. 24A to Pl.'s Mot. for Partial Summ. J., Jeffry Sailer Depo., p. 156.

conditioned on Plaintiff's obtaining leases for at least three of the six venues subject to the RFP, Plaintiff procured the assistance of Defendant's Chief Executive Officer to overturn the San Antonio Airport's recommendation that the six venues be awarded to Plaintiff's competitor.[19]   Plaintiff was unsuccessful at overturning the San Antonio Airport's recommendation at a subsequent City Council meeting on January 21, 2010, and thus failed to obtain any of the six leases at issue.[20]   Throughout the remainder of 2010, Plaintiff and the City of San Antonio signed agreements establishing end dates for Plaintiff's operation of the aforementioned venues at the San Antonio Airport.[21]   For these six venues, HDS achieved gross revenues in the amount of $5,400,000 and $4,900,000 during fiscal years 2010 and 2011, respectively.

At the Austin Airport, Plaintiff continued Defendant's negotiations with Harlon's to take over Harlon's venues and entered into a Purchase Agreement and Bill of Sale ("Harlon's Agreement") with Harlon's on February 16, 2009.[22]   The Harlon's Agreement

---

[19]    See Doc. 69-32, Ex. 24A to Pl.'s Mot. for Partial Summ. J., Jeffry Sailer Depo., p. 156; Doc. 69-4, Ex. 3 to Pl.'s Mot. for Partial Summ. J., Brian Weiner Depo., pp. 139-40.

[20]    See Doc. 69-33, Ex. 24B to Pl.'s Mot. for Partial Summ. J., San Antonio City Council Work Session and Reg. Meeting Meeting Minutes Dated Jan. 20 & 21, 2010, pp. 14-17.

[21]    See Doc. 69-42, Ex. 27 to Pl.'s Mot. for Partial Summ. J., San Antonio Airport 3rd Amendment to Concession Agreements for Terminal 1, Spaces 140, 154, and 178, and for Terminal 2, Spaces 204, 260, and 262.

[22]    See Doc. 69-44, Ex. 29 to Pl.'s Mot. for Partial Summ. J., Harlon's Agreement.

included a section entitled "Conditions to Closing," wherein the parties agreed that they had "entered into a mutually acceptable agreement whereby [Harlon's] liquor license(s) in effect at Closing shall continue to be utilized for the businesses operated at the Concessions for a transition period until [Plaintiff] obtains new liquor licenses."[23]

Three days later, on February 19, 2009, the Texas Alcoholic Beverage Commission ("TABC") suspended Harlon's liquor license for delinquent mixed beverage and sales taxes.[24]   Harlon's did not remedy the deficiency and, therefore, its liquor license remained under suspension.[25]   Seven weeks after Harlon's liquor license was suspended, on April 9, 2009, Plaintiff notified Harlon's that, as a result of Harlon's failure to meet the closing conditions of the Harlon's Agreement, the agreement could not be effected.[26]   Harlon's lease agreement with the City of Austin was subsequently terminated; Plaintiff did not obtain the leases to Harlon's venues.[27]

---

[23]     Id. § 3.

[24]     See Doc. 69-44, Ex. 29 to Pl.'s Mot. for Partial Summ. J., Emails re: Harlon's Back Taxes; Doc. 69-46, Ex. 31 to Pl.'s Mot. for Partial Summ. J., Michael Schrampfer Depo., pp. 8-10.

[25]     See Doc. 69-46, Ex. 31 to Pl.'s Mot. for Partial Summ. J., Michael Schrampfer Depo., p. 16.

[26]     See Doc. 69-45, Ex. 30 to Pl.'s Mot. for Partial Summ. J., Letter from HDS to Kenneth Walker re: Harlon's Agreement.

[27]     See Doc. 69-25, Ex. 18 to Pl.'s Mot. for Partial Summ. J., Notice of Termination; Doc.

Following the dissolution of the Harlon's Agreement, Plaintiff sought to extend the lease terms for the venues subject to the Austin Agreement.[28]   On December 8, 2009, the Austin Airport Advisory Commission ("AAAC") voted to recommend to the Austin City Council that an extension of the Austin Agreement be granted.[29] Nine days later, on December 17, 2009, the Austin City Council approved the "negotiation and execution of an amendment" extending the lease terms of the venues subject to the Austin Agreement.[30] The amendment extending the lease terms went into effect about five months later, on May 20, 2010.[31]

## B. Procedural History

Plaintiff initiated this lawsuit against Defendant on September 22, 2010.[32]   On January 20, 2011, Defendant filed an answer to Plaintiff's complaint and a counterclaim.[33]   About five months later, Plaintiff filed its first motion for summary judgment.[34]   On motion, Defendant was given until October 31, 2011,

---

[28]   See Doc. 69-32, Ex. 24A to Pl.'s Mot. for Partial Summ. J., Letters from Aviation Dept. of Austin Airport to HDS re: Extension of Austin Agreement.

[29]   See Doc. 69-32, Ex. 24A to Pl.'s Mot. for Partial Summ. J., AAAC Meeting Minutes Dated Dec. 8, 2009, § 4(d).

[30]   Doc. 69-48, Ex. 33 to Pl.'s Mot. for Partial Summ. J., Austin City Council Minutes Dated Dec. 17, 2009, p. 4.

[31]   See Doc. 69-49, Ex. 34 to Pl.'s Mot. for Partial Summ. J.,

[32]   See Doc. 1, Pl.'s Compl.

[33]   See Doc. 6, Def.'s Ans. and Countercl.

[34]   See Doc. 25, Pl.'s 1st Mot. for Summ. J.

to respond to Plaintiff's first motion for summary judgment.[35]
Prior to this deadline, on August 18, 2011, Plaintiff filed an
amended complaint, to which Defendant filed an amended answer and
counterclaim on August 26, 2011.[36]  Plaintiff withdrew its first
motion for summary judgment on October 21, 2011.[37]

Three months later, on January 17, 2012, Defendant moved to
amend its answer and counterclaim against Plaintiff, which the
court subsequently granted.[38]  That same day, Plaintiff filed the
pending motion for partial summary judgment, to which Defendant
responded on February 21, 2012.[39]

## II.  Legal Standards

### A.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that
no genuine dispute exists regarding any material fact and the
moving party is entitled to judgment as a matter of law.  Fed. R.
Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986);
Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir.

---

[35]     See Doc. 36, Def.'s Mot. for Ext. of Time; Doc. 39, Or. Granting
Def.'s Mot. for Ext. of Time.

[36]     See Doc. 40, Pl.'s 1st Am. Compl.; Doc. 43, Def.'s 1st Am. Ans. to
Pl.'s 1st Am. Compl.; see also Doc. 41, Def.'s Orig. Ans. to Pl.'s 1st Am. Compl.

[37]     See Doc. 48, Pl.'s Withdrawal of 1st Mot. for Summ. J.

[38]     See Doc. 63, Def.'s Mot. to Amend, Def.'s 2nd Am. Ans. and
Countercl.; Doc. 83, Or. Granting Def.'s Mot. to Amend.; see also Doc. 80, Pl.'s
Resp. to Def.'s Mot. to Amend.

[39]     See Doc. 68, Pl.'s Mot. for Partial Summ. J.; Doc. 86, Def.'s
Sealed Resp. to Pl.'s Mot. for Partial Summ. J.; see also Doc. 96, Pl.'s Reply
in Support of Motion for Partial Summ. J.

2003).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 271 F.3d 624, 626 (5ᵗʰ Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  *Anderson*, 477 U.S. at 250; *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5ᵗʰ Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  *Celotex Corp.*, 477 U.S. at 323; *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5ᵗʰ Cir. 1992).  If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment.  *Celotex Corp.*, 477 U.S. at 322.  In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial.  *Id.* at 324.

When considering the evidence, "[d]oubts are to be resolved in

favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." <u>Evans v. City of Houston</u>, 246 F.3d 344, 348 (5th Cir. 2001); <u>see also</u> <u>Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.</u>, 288 F.3d 222, 227 (5th Cir. 2002).  The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." <u>Honore v. Douglas</u>, 833 F.2d 565, 567 (5th Cir. 1987).

However, the nonmoving party must show more than "some metaphysical doubt as to the material facts." <u>Meinecke v. H & R Block of Houston</u>, 66 F.3d 77, 81 (5th Cir. 1995).  Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden.  <u>Brown</u>, 337 F.3d at 541; <u>Ramsey v. Henderson</u>, 286 F.3d 264, 269 (5th Cir. 2002).  The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322.

**B.  <u>Contract Interpretation</u>**

As this declaratory action is in federal court under diversity jurisdiction, state law governs substantive matters.  <u>Erie R.R. v. Tompkins</u>, 304 U.S. 64, 78 (1938).  The parties do not dispute that Texas law applies here.

In construing the terms of a contract, the court's primary purpose is always to ascertain the true intent of the parties as expressed in the written instrument. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). To this end, the court reads all provisions within the contract as a whole and gives effect to each term so that no part of the agreement is left without meaning. MCI Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 652 (Tex. 1999); see also Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex. 2003). "Terms in contracts are given their plain, ordinary, and generally accepted meaning unless the contract itself shows that particular definitions are used to replace that meaning." Bituminous Cas. Corp. v. Maxey, 110 S.W.3d 203, 208-09 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

When a contract as worded can be given "a definite or certain legal meaning," then it is unambiguous as a matter of law, and the court enforces it as written. CBI Indus., Inc., 907 S.W.2d at 520; see also Fiess v. State Farm Lloyds, 202 S.W.3d 744, 746 (Tex. 2006). The court will not find a contract ambiguous merely because the parties advance conflicting interpretations. See Fiess, 202 S.W.3d at 746.

### III.  Analysis

Plaintiff moves for summary judgment on its claim for declaratory judgment and Defendant's counterclaims, seeking a

declaration that Defendant is not entitled to any earnout payment under the Stock Purchase Agreement and that Plaintiff did not breach the Stock Purchase Agreement by not making earnout payments to Defendant.

## A.   The San Antonio Agreement

Plaintiff argues that the conditions precedent to Defendant's receiving an earnout payment pursuant to § 2.4.1(a) of the Stock Purchase Agreement were not satisfied.  The earnout provision, as amended, reads as follows:

> If, prior to the third (3rd) anniversary of the Closing Date [December 11, 2008], the San Antonio Agreements are amended, restated or substituted such that the terms and conditions of such amendment, restatement, or substitution and the pro forma operation of the Business of Subsidiaries of Companies parties to the San Antonio Agreements would result in gross revenues of at least six million five hundred thousand dollars and no cents ($6,500,000.00) for the fiscal year ending December 31, 2010 or the fiscal year ending December 31, 2011, in accordance with the projections to be prepared and submitted by [Plaintiff] in response to the request for proposal from the City of San Antonio, Texas in respect of San Antonio International Airport, then upon the execution and delivery (even if the execution and delivery occurs after the third (3rd) anniversary of the Closing Date) of one or more agreements in writing evidencing such terms and conditions with respect to all of the San Antonio Agreements, [Plaintiff] shall pay to Defendant the aggregate amount of six hundred thousand dollars and no cents ($600,000.00).[40]

The parties do not dispute that the language of the abovementioned

---

[40]   Doc. 69-1, Ex. 1A to Pl.'s Mot. for Partial Summ. J., Share Purchase Agreement, p. 20, Art. II, § 2.4.1(a).

earnout provision is clear and unambiguous.[41]

Under the Stock Purchase Agreement, the "San Antonio Agreements" are defined as consisting of venue spaces 112, 114, 140, 154, 178, 204, 260, and 262.[42] The plain language of the earnout provision detailed in § 2.4.1(a) requires that (1) the San Antonio Agreements be amended, restated, or substituted; (2) the terms and conditions of such amendment, restatement, or substitution and the pro forma operations of the venues be such that would result in at least $6,500,000 in gross revenues for the fiscal year 2010 or 2011; and (3) the pro formas resulting from the aforementioned amendments be in accordance with projections submitted by Plaintiff in response to an RFP from the City of San Antonio.

Plaintiff, however, goes beyond the plain language of the provision, arguing that the amendments contemplated by § 2.4.1(a) are those that would have resulted from Plaintiff's winning the RFP issued by the San Antonio Airport.[43] Nowhere does the provision require that an amendment be tied to Plaintiff's success in the RFP process. Rather, the provision expressly requires that an

---

[41] See Doc. 40, Pl.'s 1st Am. Compl., ¶ 24; Doc. 86, Def.'s Sealed Resp. to Pl.'s Mot. for Partial Summ. J., p. 4.

[42] See Doc. 69-1, Ex. 1A to Pl.'s Mot. for Partial Summ. J., Stock Purchase Agreement, pp. 11-12, Art. 1, § 1.2.

[43] Plaintiff advances deposition testimony in support of its interpretation that the San Antonio earnout provision was premised on Plaintiff's winning the RFP. As the terms of the provision are clear and unambiguous, the court declines to consider extrinsic evidence of the parties' intent.

amendment of the San Antonio Agreements have terms and conditions that are connected to the revenue stream for fiscal years 2010 and 2011.[44]

The provision also requires that these connections and the pro forma operation of the venues produce gross revenues of at least $6,500,000, in accordance with Plaintiff's projections in its response to the RFP.  Plaintiff contends that its pro formas were based on its winning the RFP.  Again, the language of the provision does not make the pro formas contingent on Plaintiff's success in the RFP process.  The clause reading "in accordance with the projections to be prepared and submitted by [Plaintiff] in response to the [RFP] from the City of San Antonio . . ." indicates that Plaintiff's projections pursuant to the RFP should serve as the basis for Plaintiff's pro formas, regardless of whether Plaintiff wins the RFP.[45]

The court further notes that, contrary to Plaintiff's interpretation that venue spaces 112 and 114 should not be included in a calculation determining the gross revenues of the San Antonio venues, the express language of  § 2.4.1(a) references the San Antonio Agreements, which, by definition, include venue spaces 112 and 114.[46]  The court therefore finds that the provision calls for

---

[44]    See Doc. 69-1, Ex. 1A to Pl.'s Mot. for Partial Summ. J., Stock Purchase Agreement, at p. 20, Art. II, § 2.4.1(a).

[45]    Id.

[46]    See id.; see also id. at pp. 11-12, Art. 1, § 1.2

the inclusion of the revenues of venue spaces 112 and 114, provided the other conditions precedent are satisfied as to those venues, in calculating the gross revenues for fiscal years 2010 and 2011.

Given that Plaintiff's summary judgment arguments are contingent on its contrary interpretation of the plain language of the provision, the court finds that Plaintiff has failed to bear its summary judgment burden of establishing that the conditions precedent of § 2.4.1(a) were not met.  The court accordingly recommends that summary judgment in favor of Plaintiff be denied as to the San Antonio earnout provision set forth in § 2.4.1(a) of the Stock Purchase Agreement.

**B.**   **The Austin Agreement**

Plaintiff also contends that Defendant is not entitled to an earnout payment pursuant to § 2.4.1(c) of the Stock Purchase Agreement because the conditions precedent therein were not satisfied.  Section 2.4.1(c) of the Stock Purchase Agreement specifically required an earnout payment to Defendant if:

> prior to the first (1st) anniversary of the Closing Date [December 11, 2008], the Austin Agreement is amended so that the term of the Austin Agreement expires no sooner than June 30, 2016, then upon (i) the execution and delivery (even if the execution and delivery occurs after the first (1st) anniversary of the Closing Date) of an agreement in writing evidencing such amendment to the Austin Agreement, and (ii) the execution and delivery (even if the execution and delivery occurs after the first (1st) anniversary of the Closing Date) by the City of Austin, Texas, and Bergstrom Capital News LLC (or its successor in interest) of a lease agreement for the lease of all the premises located at Austin-Bergstrom

17

> International Airport that are currently subject to
> the Austin Bergstrom Agreement . . . for a term that
> expires no sooner than June 30, 2016, containing such
> terms  and  conditions  as  shall  be  reasonably
> acceptable  to  [Plaintiff]  or  an  Affiliate  thereof
> (the "<u>Harlon [Agreement]</u>"), [Plaintiff] shall pay to
> [Defendant]  the  aggregate  amount  of  five  hundred
> thousand dollars and no cents ($500,000.00).[47]

Pursuant to the Stock Purchase Agreement, both conditions precedent must be satisfied in order for Defendant to be entitled to an earnout payment under the Austin Agreement.  Because the latter condition precedent is dispositive, the court begins and ends with consideration of that condition precedent.

The relevant condition precedent of the earnout provision related to the Austin Agreement requires that Plaintiff obtain a lease agreement for a term extending until at least June 2016 for the venues operated by Harlon's.  The parties do not dispute that the condition was not satisfied.  Defendant, however, contends that the condition was not satisfied due to the intentional or negligent conduct of Plaintiff in failing to close the Harlon's Agreement or to acquire new leases on the same venues directly from the Austin Airport.  As a result of Plaintiff's conduct, Defendant argues, the condition precedent is eliminated, or "is deemed to have been met."[48]

Defendant cites <u>Anbeck Co. v. Zapata Corp.</u>, 641 S.W.2d 608

---

[47]    <u>See id.</u> at p. 20, Art. II, § 2.4.1(c); Doc. 69-29, Ex. 21 to Pl.'s Mot. for Partial Summ. J., 2nd Am. to Share Purchase Agreement.

[48]    Doc. 86, Def.'s Sealed Resp. to Pl.'s Mot. for Partial Summ. J., p. 5.

(Tex. App.- Houston [14th Dist.] 1982, writ ref'd n.r.e.), and Ebberts v. Carpenter Prod. Co., 256 S.W.2d 601 (Tex. Civ. App.- Beaumont 1953, writ ref'd n.r.e.) in support of its position that, because of Plaintiff's intentional or negligent conduct in not closing the Harlon's Agreement and not acquiring the Harlon's venues directly from the Austin Airport, the condition precedent is is eliminated.  The court finds that Defendant's reliance on these cases is misplaced given the current state of Texas law regarding the doctrine of prevention.

In the context of conditions precedent, the doctrine of prevention "provides that when a promisor wrongfully prevents a condition from occurring that condition is excused." Mendoza v. COMSAT Corp., 201 F.3d 626, 631 (5th Cir. 2000).  This doctrine "is subsumed under the duty of good faith and fair dealing." Id.; see Restatement (Second) of Contracts § 230 ("The obligor's duty is not discharged if occurrence of the event (a) is the result of a breach by the obligor of his duty of good faith and fair dealing").  Under Texas law, however, "[t]here is no general duty of good faith and fair dealing in ordinary, arm's-length commercial transactions." Formosa Plastics Corp., USA v. Presidio Engineers and Contractors, Inc., 960 S.W.2d 41, 52 (Tex. 1998).  Further, courts do not read implied covenants of good faith into every contract.  See English v. Fischer, 660 S.W.2d 521, 522 (Tex. 1983).  Given this ordinary, arms-length commercial transaction between two sophisticated

parties, the court will not read a duty of good faith and fair dealing into § 2.4.1(c) of the Stock Purchase Agreement, wherein the parties did not evidence an intent to be bound by such a duty. In the absence of a duty of good faith and fair dealing, the doctrine of prevention is inapplicable. Thus, Defendant has failed to raise a question of material fact as to the non-occurrence of the condition precedent set forth in § 2.4.1(c)(ii) of the Stock Purchase Agreement.

Given that satisfaction of the condition precedent concerning the Harlon's Agreement and the venues therein, as detailed in § 2.4.1(c)(ii), was necessary to Defendant's being entitled to an earnout payment, and because the court finds that, as a matter of law, § 2.4.1(c)(ii) was not satisfied, the court recommends that summary judgment be granted in favor of Plaintiff on the earnout provision of § 2.4.1.(c) of the Stock Purchase Agreement.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's Motion for Partial Summary Judgment be **GRANTED IN PART, DENIED IN PART**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period

mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this <u>24th</u> day of August, 2012.

Nancy K. Johnson
United States Magistrate Judge